UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF INDIANA
INDIANAPOLIS DIVISION

| | |
|---|---|
| ESI ENVIRONMENTAL, INC., )<br>    Plaintiff, )<br>)<br>vs. )<br>)<br>AMERICAN INTERNATIONAL SPECIALTY )<br>LINES INSURANCE COMPANY, )<br>    Defendant. )<br>_____ )<br>)<br>ESI ENVIRONMENTAL, INC. )<br>    Consolidated Plaintiff, )<br>)<br>vs. )<br>)<br>NATIONAL UNION FIRE INSURANCE )<br>COMPANY OF PITTSBURGH, )<br>    Consolidated Defendant. ) | 1:07-cv-1182-LJM-DML |

**ORDER ON CONSOLIDATED DEFENDANT'S MOTION TO DISMISS**

This matter comes before the Court on consolidated defendant's, National Union Fire Insurance Company of Pittsburgh ("National Union"), Motion to Dismiss. Plaintiff, ESI Environmental, Inc. ("ESI"), initiated separate actions against defendant, American International Specialty Lines Insurance Company ("AISLIC") and National Union (collectively, the "Defendants"). On October 5, 2009, the Court consolidated those actions. ESI seeks a declaratory judgment that the insurance policies the Defendants sold to ESI provide coverage for oil contamination that occurred at ESI's property. National Union now moves the Court to Dismiss ESI's Complaint pursuant to Federal Rule of Civil Procedure 12(b). Specifically, National Union moves the Court to decide (1) whether the Court has subject matter jurisdiction over ESI's claim against National Union, and (2) whether ESI's

Complaint states a claim against National Union upon which relief may be granted. Fed. R. Civ. P. 12(b)(1) and (6).

The Court has considered the parties' arguments. For the following reasons, National Union's Motion to Dismiss is **GRANTED in part and DENIED in part**.

## I. BACKGROUND

### A. ALLEGATIONS IN THE COMPLAINT

According to the facts alleged in ESI's Complaint:

ESI operates a used oil processing facility that receives used oil from other entities in order to recycle the oil and redistribute it to its customers. Compl. ¶¶ 6-7. On July 18, 2007, one of ESI's customers informed ESI that the customer discovered about twenty-two parts per million ("PPM") of polychlorinated biphenyls ("PCBs") in a used oil shipment the customer received from ESI. *Id.* ¶ 7. ESI determined that it had received contaiminated oil from an oil broker that certified the oil was free of PCBs. *Id.* By the time ESI received notice of the oil contamination, it had already processed the PCB-contaminated loads of used oil through its plant. *Id.* ¶ 8. Consequently, the PCBs from the contaminated shipments mixed with, and cross-contaminated, ESI's equipment and the other oil in the ESI system (the "Contamination Event"). ESI has been unable to process oil at full capacity since the Contamination Event occurred. *Id.* ¶ 9.

Since August 2007, PCB-contaminated solids in a one million gallon tank at ESI ("Tank 51") have settled and compacted, making those solids more difficult to remove. The "unreasonably protracted decontamination of [ESI's] tanks" forced ESI to rent "frac tanks"

from a third party. *Id.* ¶ 19. Tank 51 is an integral part of ESI's used oil dehydration process, and its inability to use Tank 51 since the Contamination Event caused ESI to incur increased operating costs and negatively impacted ESI's ability to process used oil. *Id.* ¶ 20. ESI lost approximately 845,000 gallons of processed oil that was ready to sell, which cost ESI hundreds of thousands of dollars in lost profit. *Id.* ¶ 21. Through the ongoing decontamination process, ESI lost and continues to lose additional oil that it could sell but for the Contamination Event. *Id.* ¶ 22. ESI's other processes slowed due to the Contamination Event, causing additional lost profits and business interruption expenses. *Id.*

National Union is a national insurance company doing business in Indiana and throughout the United States. *Id.* ¶ 2. AISLIC sold a general liability policy to ESI. *Id.* ¶ 10. AISLIC and National Union are both member companies of American International Group, Inc. ("AIG").

National Union sold a first-party property insurance policy (the "Policy") to ESI, providing coverage from December 1, 2005, through December 1, 2008. *Id.* ¶ 11, Compl. Ex. A.[1] A Policy renewal and other related sections are attached to the Complaint as exhibits B through D. The Policy "covers the property insured hereunder against all risks of direct physical loss or damage occurring during the period of th[e] Policy from any external cause, except as hereinafter excluded or limited." Compl. Ex. C, ¶ 1. The Policy defines an "occurrence" as "an event or a continuous exposure to conditions which causes

---

[1] "A copy of a written instrument that is an exhibit to a pleading is a part of the pleading for all purposes." Fed. R. Civ. P. 10(c); *see Centers v. Centennial Mortg., Inc.*, 398 F.3d 930, 934 (7th Cir. 2005).

direct physical loss or damage or destruction to property insured." Compl. ¶ 12, Ex. C at 6. The Policy requires National Union to pay "against loss directly resulting from necessary interruption of business caused by destruction of or damage to real or personal property covered herein . . . and arising from a peril covered hereunder and occurring during the terms of th[e] Policy . . . ." *Id.* ¶ 13, Ex. D at 1.

In addition, the Policy provides:

CONDITIONS:

a. Requirements in Case Loss Occurs

Every loss hereunder shall be reported in writing as soon as practicable in full particulars to the Company through Starr Technical Risks Agency, Inc. The Insured shall protect the property from further damage, forthwith separate the damaged and undamaged personal property, put it in the best possible order, furnish a complete inventory of the destroyed, damaged and undamaged property, showing in detail quantities, costs, value and amount of loss claimed; and sixty days after the loss, unless such time is extended in writing by this Company, the Insured shall render to this Company a proof of loss, signed and sworn to by the Insured, stating the knowledge and belief of the Insured as to the following:

1. The time and origin of the loss;

2. The interest of the Insured and of all other in the property;

3. The value of each item thereof and the amount of loss thereto;

4. All encumbrances thereon;

5. All other contracts of insurance whether valid or not, covering any of said property;

6. Any changes in the title, use, occupation, location, possession or exposures of said property since the issuing of this Policy;

7. By whom and for what purposes any building herein described and the several parts thereof were occupied at the time of loss whether or not it then stood on leased ground.

If this Policy provides any Business Interruption coverage, the Insured shall, in addition to the above, also give immediate written notice to this Company through Starr Technical Risks Agency, Inc., of any Business Interruption loss and protect the property from further damage that might result in extension of the period of interruption; and within sixty (60) days following the date of damage to or destruction of the real or personal property described, unless such time is extended in writing by this Company, the Insured shall render to this Company a proof of loss, signed and sworn to by the Insured, stating the knowledge and belief of the Insured as to the following:

1. The time and origin of the property damage or destruction causing the interruption of business.

2. The interest of the Insured and of all others in the business;

3. All other contracts of insurance, whether valid or not, covering in any manner the loss insured against by the Policy;

4. Any changes in title, nature, location, encumbrance, or possession of said business since the issuing of this Policy; and

5. By whom and for what purpose any building herein described and the several parts thereof were occupied at the time of damage or destruction, and shall furnish a copy of all the descriptions and schedules in all policies, and the actual amount of Business Interruption value and loss claimed, accompanied by detailed exhibits of all values, costs, and estimates upon which such amounts are based.

The Insured shall furnish a copy of all descriptions and schedules in all policies if required, verified plans and specifications of any building, fixtures or machines destroyed or damaged. The Insured, as often as may be reasonably required, shall exhibit to any person designated by this

> Company all that remains of any property herein described, and shall submit and insofar as is within its power, cause its employees and others to submit to examinations under oath by any person named by this Company and subscribed to the same, and, as often as may be reasonably required, shall produce for examination all books of account, bills, invoices and other vouchers, or certified copies thereof if originals by lost, at such reasonable time and place as may be designated by this Company or its representative, and shall permit extracts and copies thereof to be made.

Def.'s Ex. B at 22-23.

ESI timely notified National Union and Lockton Companies of St. Louis ("Lockton"), the broker that placed the Policy with ESI, about the Contamination Event. *Id.* ¶ 14. Thereafter, ESI fully cooperated with National Union's assigned adjuster, Michael Eyster ("Eyster") of Technical Loss Adjustment and Appraisal, LLC ("TLAA"). *Id.* Eyster toured ESI's facility, and ESI provided Eyster the same damages information it provided to AISLIC. *Id.* Although ESI paid the Policy premiums in full and satisfied all other conditions to coverage, neither AISLIC nor National Union paid ESI's submitted damages promptly. *Id.* ¶¶ 15-16. Likewise, neither paid ESI for its lost profits or business interruption expenses. *Id.*

### B. EVIDENCE SUBMITTED BY THE PARTIES

The parties submitted additional evidence in support of their respective positions. Normally, district courts do not consider submitted evidence to decide a Rule 12(b) motion to dismiss. Here, the Court considers the submitted evidence only to the extent it is relevant to National Union's motion to dismiss for lack of subject matter jurisdiction.

The evidence submitted primarily consists of written communication between ESI's representatives and attorney, and National Union's representatives and attorney. The submitted evidence confirms that ESI notified National Union of the Contamination Event. Def.'s Ex. C, ¶ 3. National Union employed Eyster to adjust ESI's claim, and ESI's counsel, Curt DeVoe ("DeVoe"), arranged a walk-through of the facility with Eyster. Pl.'s Ex. A at 1-2. Following Eyster's September 4, 2007, facility tour, Eyster contacted Tonya Bond ("Bond"), counsel for ESI, to request that she "forward the claim information" discussed during the tour. *Id.* at 5. Eyster previously indicated that appropriate claim information would include information about "all related clean up, building damage, contents damage, business income, extra expenses[,] and any other items." *Id.* at 1.

On September 25, 2007, Bond delivered to Eyster "several documents [to] help [Eyster] . . . understand[ ] ESI's process and the claim." *Id.* at 3, 6-19. Bond instructed Eyster to "Please let me know if you have additional questions after reviewing the documents." *Id.* at 3.

On July 1, 2008, Eyster sent an email to DeVoe per the request of National Union "to determine if a claim is going to be filed regarding" the Contamination Event." *Id.* at 21-22. Bond responded

> ESI has already filed a claim with AIG and believes that there is coverage under both its property and liability policies. I have copied Chris Ferragamo on this response because he is AIG's counsel who we have been working with to resolve the claims. Please let me know immediately if ESI should be including someone else in communications regarding these claims. Otherwise, it is our understanding that we should be communicating through Mr. Ferragamo and that AIG will evaluate the claims under all policies providing coverage.

7

*Id.* at 21.  On July 7, 2008, Eyster responded that he had contacted his principal contact who was "handing the claim under the property policy for AIG."  *Id.*  The contact requested that Bond forward to Eyster a copy of the claim ESI prepared.  *Id.*  The contact did not know who Chris Ferragamo was, and stated that the contact could not "evaluate the claim made under the property policy until such time as the claim [wa]s filed and then evaluated."  *Id.*

Bond responded the next day, informing Eyster that "ESI ha[d] already provided all of its claim information for this claim to AIG."  *Id.* at 20.  She attached to her correspondence AIG's reservation of rights letter and ESI's response.  *Id.* at 24-46.  In addition, Bond provided Eyster the identity of the adjuster handling ESI's claims, Glenn Serrano, and Ferragamo, who according to Bond was AIG's attorney handling the claims. *Id.*  Bond suggested to Eyster that AIG's adjusters and counsel "work together in order to make the policyholder whole."  *Id.*  Bond continued, "[i]f, however, ESI needs to submit two claims to AIG in order to obtain coverage under all of its AIG policies, please let me know."  *Id.*

> On August 1, 2008, Eyster replied:
>
> We have reviewed the information you provided and have done some research. The information provided is for a claim filed under policy number EGU 1955726. The claim we are adjusting has been reported under policy number 2610569. This policy was issued by National Union Fire Insurance Company of Pittsburgh, PA . . . . It is being adjusted under AIG claim number 229-6641. Therefore, we are requesting a copy of any claim intended to be filed under this policy. Once we have received this material, we will continue in the adjustment of this matter.

Pl.'s Ex. A at 47-48.  That same day, Bond responded: "ESI is seeking coverage under all of its policies for all of the damages sustained in this claim."  Ex. A at 47.  Bond asked

Eyster to clarify what he meant by "a copy of any claim intended to be filed." *Id.* In addition, Bond attached to her correspondence another ninety-six pages of information, and she indicated that ESI would submit "additional damages . . . including attorneys' fees, cleanup, costs, and lost revenue," but that ESI would "not know the full extent of the damages until the cleanup is complete." *Id.* at 47, 53-219.

On August 29, 2008, Eyster replied to Bond's August 1, 2008, email: "Tonya, . . . [w]e still have not received any claim form (sp) you or the insured. Please advise the time frame when we might expect this . . . ." *Id.* On September 1, 2008, Bond re-sent the information she sent to Eyster on August 1, 2008. *Id.* at 155. In addition, she stated to Eyster "[p]lease let me know if you need additional information to consider this claim submitted." *Id.*

Finally, on October 22, 2008, Eyster replied to Bond's September 1, 2008 submission:

> As a follow up to your email and other correspondence received dated 9/1/08, it appears that you have already filed a claim and received confirmation of coverage from American International Specialty Lines Insurance Company. However, you advise there is still [an] additional claim to be made. Please advise the status of the clean up of the facility. Has any additional claim been made? What, if any, claim is to be filed against the policy noted above?

Eyster's Second Aff., Ex. A.

## II. **STANDARD**

### A. **RULE 12(b)(1)**

"Subject matter jurisdiction is the first question in every case, and if the court concludes that it lacks jurisdiction it must proceed no further." *Illinois v. City of Chicago*,

9

137 F.3d 474, 478 (7th Cir. 1998). On a motion to dismiss under Rule 12(b)(1) for lack of subject matter jurisdiction, the Court "must accept as true all well-pleaded factual allegations and draw all reasonable inferences in favor of the plaintiff." *Allice-Hernandez v. Catholic Bishop of Chi.*, 320 F.3d 698, 701 (7th Cir. 2003). However, "[w]hen considering a motion that launches a factual attack against jurisdiction, the [Court] may properly look beyond the jurisdiction allegations of the complaint and view whatever evidence has been submitted on the issue to determine whether in fact subject matter jurisdiction exists." *Apex Digital, Inc.*, 572 F.3d at 444 (internal quotations omitted). Additionally, "[t]he plaintiff has the obligation to establish jurisdiction by competent proof. *Sapperstein v. Hager*, 188 F.3d 852, 855 (7th Cir. 1999)

### B. RULE 12(b)(6)

Rule 12(b)(6) permits the dismissal of a claim for failure of the pleadings to state a claim upon which relief can be granted. Fed. R. Civ. P. 12(b)(6). A pleading must contain a "short and plain statement of the claim showing that the pleader is entitled to relief." Fed. R. Civ. P. 8(a)(2). Detailed factual allegations are not required, but a plaintiff's complaint may not merely state "an unadorned, the-defendant-unlawfully-harmed-me accusation." *Ashcroft v. Iqbal*, 556 U.S. ----, 129 S.Ct. 1937, 1949 (2009). Rather, "a complaint must contain sufficient factual matter . . . to 'state a claim to relief that is plausible on its face.'" *Id.* (quoting *Twombly*, 550 U.S. at 570). "A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Id.* (citing *Twombly*, 550 U.S. at 556).

### III.  DISCUSSION

ESI's Complaint asserts a claim for breach of contract and a claim for declaratory relief.  National Union argues that both claims are not ripe, and that, in any event, neither claim states a claim upon which relief can be granted.  The Court considers National Union's arguments regarding ripeness first.

### A.  RULE 12(b)(1) MOTION

With respect to ESI's claim for declaratory relief, the Declaratory Judgment Act (the "Act") provides that "[i]n a case of actual controversy within its jurisdiction, . . . any court of the United States . . . may declare the rights and other legal relations of any interested party seeking such declaration . . . ."  28 U.S.C. § 2201(a).  When determining whether an "actual controversy" exists under the Act, the question is whether there is a controversy between the parties with adverse legal interests "of sufficient immediacy and reality to warrant issuance of a declaratory judgment."  *In re VMS Sec. Litig.*, 103 F.3d 1317, 1327 (7th Cir. 1996) (citations omitted).

Here, National Union argues that ESI's claim for declaratory relief is not ripe for adjudication because ESI never filed a formal claim and proof of loss with National Union.  The Seventh Circuit's decision in *Atlanta Int'l Ins. Co. v. Atchison, Topeka and Santa Fe Railway Co.*, 938 F.2d 81 (7th Cir. 1991), sheds light on the issue.  In *Atlanta Int'l*, an excess liability insurer brought suit against an insured seeking a determination that its policy did not provide coverage for a federal district court judgment against the insured.  983 F.2d at 82.  After a judgment from the district court was rendered against the insured, the insured mailed its nearly 170 general liability insurers, including the declaratory plaintiff, to notify the

11

insurers of the verdict. Upon receipt of the letter, the excess liability insurer sought a declaration under the Act that the loss created by the judgment did not fall within the terms of the coverage provided in the policy it issued to the insured. The insured moved to dismiss under Rule 12(b)(1), citing the lack of an "actual controversy" under the Act. The district court granted the motion, concluding that the letter sent by the insured to its insurance providers did not constitute a demand for payment; therefore, there was no actual controversy. *Id.* at 82-83.

The Seventh Circuit agreed. The court held that the case lacked an actual controversy because "the requisite 'injury'–a claim for payment by [the insured]–neither occurred nor was it immediately threatened by any of [the insured's] actions." *Id.* at 83. Importantly, the insured instructed all of its 170 insurance providers that it had not decided which policy year or years were implicated by the court judgment. *Id.* Moreover, the Court noted that the insured sent the notification letter to all of its insurance providers, not just the insurer seeking declaratory relief. *Id.* at 83-84. Consequently, "there [wa]s no definite indication that [the insurer] was actually expected to pay anything as a result of the letter." *Id.*

Here, the evidence submitted by the parties, viewed in ESI's favor, demonstrates that ESI and National Union have an "actual controversy." Unlike in *Atlanta Int'l*, ESI made several attempts to place National Union on notice of ESI's expectation that National Union would, at the very least, share in the expense of the Contamination Event. As the summary of the correspondence exchanges above indicates, Bond, on several occasions, submitted voluminous materials to Eyster, each time explaining to Eyster that the submitted materials supported ESI's claim under the Policy for the Contamination Event. Moreover, unlike in

*Atlanta Int'l* where the insured had not decided which of its insurance policies were implicated, ESI directly and consistently informed National Union that ESI believed the Contamination Event was covered by the Policy. Contrary to National Union's arguments, strict compliance with an insurance contract's notice provisions is not a pre-requisite to an "actual controversy" under the Act. The Court concludes that, compared to the facts and reasoning in *Atlanta Int'l*, there is a controversy between the parties with adverse legal interests "of sufficient immediacy and reality to warrant issuance of a declaratory judgment." *In re VMS Sec. Litig.*, 103 F.3d at 1327 (citations omitted).

Next, National Union argues ESI's breach of contract claim is not ripe because National Union never made a coverage decision. In other words, even assuming the Contamination Event is covered by the Policy, ESI's breach of contract claim is premature because National Union never actually denied coverage. The Court agrees. The requisite act to make ESI's breach of contract claim ripe–namely, a decision by National Union to deny coverage–never occurred. Therefore, there is no live controversy, and the Court must dismiss ESI's claim for breach of contract.

In summary, the Court retains subject matter jurisdiction over ESI's claim for declaratory relief, but not ESI's claim for breach of contract.

### B.  RULE 12(b)(6) MOTION

The Court notes that the parties relied extensively on the submitted evidence with respect to National Union's 12(b)(6) motion. Apparently, the parties seek a ruling on the merits of National Union's potential affirmative defenses related to the Policy's written notice and proof of loss requirements. However, at this stage in the litigation, the Court declines

the parties' invitation to rule on the merits of ESI's claims or National Union's potential defenses to those claims. Rather, the Court will only consider whether the Complaint states a claim upon which relief can be granted.

After considering the parties' arguments and the allegations contained in the Complaint, the Court concludes that ESI's complaint sufficiently pleads a claim for declaratory relief under the Act. As stated above, the Complaint details the relevant facts related to the Contamination Event and the resulting damages. It also explains that National Union sold the applicable Policy to ESI, that the Contamination Event occurred during the Policy's applicable time periods, and that the Contamination Event is covered by the Policy. Finally, the Complaint alleges that all conditions to coverage have been satisfied, excused, or waived." In summary, the Complaint asserts a claim for declaratory relief that is plausible on its face. 28 U.S.C. § 2201(a); *Iqbal*, 129 S.Ct. at 1949.

## IV.  CONCLUSION

For the foregoing reasons, consolidated defendant's, National Union Fire Insurance Company of Pittsburgh, Motion to Dismiss (Dkt. No. 68) is **GRANTED in part and DENIED in part**.

IT IS SO ORDERED this 10th day of February, 2010.

_____
LARRY J. McKINNEY, JUDGE
United States District Court
Southern District of Indiana

Distribution attached.

Distribution to:

Dean R. Brackenridge
FROST BROWN TODD LLC
dbrackenridge@fbtlaw.com

Richard W. Bryan
JACKSON & CAMPBELL, P.C.
rbryan@jackscamp.com

Carrie Gibson Doehrmann
FROST BROWN TODD LLC
cdoehrmann@fbtlaw.com

Christopher P. Ferragamo
JACKSON & CAMPBELL, P.C.
cferragamo@jackscamp.com

Alexander X. Saunders
CLAUSEN MILLER, P.C.
asaunders@clausen.com

Michael T. Scanlon
BARNES & THORNBURG LLP
michael.scanlon@btlaw.com

Kevin C. Schiferl
FROST BROWN TODD LLC
kschiferl@fbtlaw.com

Marie L. VanDam
mvandam@jackscamp.com

William G. Zieden-Weber
CLAUSEN MILLER, P.C.
wzieden-weber@clausen.com